UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

LEONARD W. ALLEN,

                Plaintiff,

    - against -

HELEN ROBINSON a/k/a HELEN
ROBINSON COX,

                Defendant.

------------------------------------------------- X

**OPINION AND ORDER**

**10 Civ. 7118 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Leonard Allen brings this diversity action against Helen Robinson Cox for damages arising out of an alleged oral contract wherein Cox agreed to pay Allen for helping her recover from a serious illness while they resided together as domestic partners.  Following Cox's motion to dismiss, Allen's sole remaining claim is premised on breach of contract.[1]  Cox now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56(a) on the grounds that (1) Allen's alleged contract is barred by the statute of frauds; (2) Allen has failed to prove the

---

[1]    *See Allen v. Cox*, No. 10 Civ. 7118, 2011 WL 2436705 (S.D.N.Y. June 16, 2011).

1

existence and/or performance of the contract; and (3) Allen has acted in bad faith in discovery thereby destroying evidence and warranting dismissal.  For the following reasons, Cox's motion is granted in full and this case is dismissed.

## II.   BACKGROUND[2]

### A.   The Parties

Allen and Cox lived together in New York City as domestic partners for more than two decades prior to 2008.[3]  Allen is a seventy-year-old man who retired from, and now collects a pension from the Consolidated Edison Railroad,

---

[2]     Both parties submitted written statements of facts pursuant to Local Civil Rule 56.1.  Although Allen initially claims to deny "each and every allegation" in Cox's 56.1 statement, he then proceeds to either admit or "neither admit nor deny" each individual allegation.  *See* Rule 56.1 Statement of Defendant ("Def. 56.1"); Plaintiff's Response to Defendant's Rule 56.1 Statement ("Pl. 56.1").  Thus, to the extent that Allen has not "specifically controverted" particular allegations, they are deemed admitted.  Local Civil Rule 56.1(c).  Allen has also submitted a brief affidavit supporting his claims.  *See* 9/22/11 Plaintiff's Affidavit in Opposition to Defendant's Motion for Summary Judgment ("Allen Aff.").  This affidavit, however, consists mostly of conclusory statements.  In addition, I cannot accept any portions of it that contradict Allen's earlier deposition testimony.  *See Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).  The facts in this case are thus taken from Defendant's Rule 56.1 Statement as well as the pleadings, declarations and exhibits, and the Deposition of Leonard Allen, *see* 4/22/11 Deposition of Leonard Allen ("Allen Tr."), Ex. F to 9/9/11 Declaration of Dan Brecher, defendant's counsel, in Support of Motion for Summary Judgment by Defendant ("Brecher Decl.").  All inferences are drawn in Allen's favor for the purpose of this motion.

[3]     *See* Def. 56.1 ¶ 2.

2

Northeast.[4]  He currently resides in New York.[5]  Cox is a fifty-five-year-old

woman who once worked as a bus driver for the New York Metropolitan

Transportation Authority.[6]  She currently resides in South Carolina.[7]  Allen and

Cox have a single child together — a thirty-year-old mentally retarded son named

Joseph.[8]  Allen lives with and cares for Joseph full-time.[9]

**B.     Cox's Illnesses**

During their relationship, Cox suffered a series of illnesses.  In 1998,

Cox's health began to deteriorate and she underwent multiple operations, including

thyroid removal as well as the removal of several cysts.[10]  Following these

operations, Cox "couldn't do anything" for about a year and Allen was her primary

caregiver while she recovered.[11]  While she was at home recovering from the

surgeries, Cox's health was "going downhill," although she was able to leave the

---

[4]      *See* Allen Tr. at 6:20-22.

[5]      *See* Def. 56.1 ¶ 3.

[6]      *See* Allen Tr. at 27:8.

[7]      *See* Def. 56.1 ¶ 4.

[8]      *See* Allen Tr. at 14:17-22.

[9]      *See id.* at 14:23-24.

[10]      *See id.* at 23:5-21.

[11]      *Id.* at 23:5-24:15.

3

house and drive alone.[12]

In 2002, Cox was diagnosed with breast cancer.[13]  To combat the cancer, Cox received chemotherapy and radiation therapy, and underwent a left simple mastectomy on April 22, 2002.[14]  During the years and months following Cox's cancer and breast surgery, Allen was her primary caregiver.[15]  Allen devoted a great deal of time after the 2002 surgery to driving Cox to and from the hospital, taking her to chemotherapy treatments, caring for her around the home, cooking for her, doing laundry for her, washing her, and giving her injections and medicines.[16] In 2002, Cox's sick mother, Juanita Porter, came to live with Cox and Allen.[17] During her visit, Allen took care of Porter in addition to Cox.[18]  Cox has been in remission since January 2005, and mammograms since that time have not revealed any recurrent cancer.[19]

---

[12]     *Id.* at 24:16-25:4.

[13]     *See* Def. 56.1 ¶ 6.

[14]     *See id.* ¶¶ 6-7.

[15]     *See* Allen Tr. at 27:18-29:12.

[16]     *See id.* at 27:18-29:12, 82:14-83:5.

[17]     *See id.* at 19:17-25.

[18]     *See id.* at 20:9-14.

[19]     *See* Def. 56.1 ¶¶ 9-12.

In addition to caring for Cox, Allen was also dealing with his own medical issues since 2005.[20]  From 2005 through 2007 Allen was hospitalized "many times" because of cataract surgery as well as heart disease.[21]  He also had a pacemaker installed in 2009.[22]  Allen maintains that these conditions did not limit his ability to care for Cox during the 2005-2006 period, though he has refused to allow Cox to obtain hospital records.[23]

## C.   Cox's Medical Malpractice Suit

Sometime in 2006, Allen informed Cox that she might have a lawsuit based on improper medical care that she had received prior to 2002.[24]  Cox consulted with the law firm of Jacoby & Meyers, and ultimately brought a medical malpractice lawsuit with a different law firm.[25]  Cox's suit ended with a $1.4 million settlement, and after deducting legal fees and expenses, Cox received

---

[20]    *See* Allen Tr. at 8:15-12:19.

[21]    *See id.* at 12:2-10.

[22]    *See id.* at 11:20-25.

[23]    *See id.* at 11:14-12:25.  At a hearing on August 2, 2011, the Court admonished Allen's attorney for such discovery failures.  *See* 8/2/11 Hearing Transcript, Ex. R to Brecher Decl. at 2-10.

[24]    *See* Def. 56.1 ¶ 5; Allen Tr. at 42:15-43:7.

[25]    *See* Allen Tr. at 40:18-23.

approximately one million dollars on or about July 1, 2009.[26]  While Allen and Cox subsisted together in harmony for over twenty years with limited means, the sudden receipt of this enormous sum destroyed their relationship.

### D.    The Alleged Agreement

Allen alleges that in June of 2006, prior to Cox's receipt of the settlement funds, Cox promised Allen that if he took care of her "until I get completely through this recovery," she would give Allen the proceeds of her settlement (the "Agreement").[27]  There is no documentation of the Agreement, and everything about it — from its making to Cox's alleged breach — is hotly disputed by the parties.[28]

#### 1.    Cox's Version of the Agreement

Cox submits that she never made such a promise at all.[29]  Cox argues that the Agreement would have made no sense given that her health had markedly improved by 2006, and that she was in no need of Allen's constant care.[30]  She also

---

[26]    *See* Def. 56.1 ¶ 5.

[27]    Complaint ("Compl.") ¶ 16.

[28]    *See* Allen Tr. at 95:4-100:25.

[29]    *See* 9/13/11 Affidavit of Helen Robinson Cox ("Cox Aff.") ¶¶ 2, 9.

[30]    *See id.* ¶¶ 3-11; *see also* Cox's physician reports from 2002-2006, Exs. G through O to Brecher Decl., showing that Cox had only follow-up and outpatient care after her mastectomy in 2002, but no hospitalizations.

denies that there were any witnesses that observed either the making of or any subsequent affirmations of the Agreement.[31]  While Cox acknowledges that there was a time when she was thankful for Allen's "comfort and assistance," that was all in the immediate aftermath of her battle with breast cancer in 2002.[32]  Cox further points to the lack of evidence submitted by Allen to support the Agreement as well as the confusing and contradictory nature of his deposition to argue that the parties never agreed to any essential terms or binding agreement in June of 2006.[33]

### 2.    Allen's Version of the Agreement

Allen described the existence and nature of the alleged Agreement in his deposition, which contains varied and incoherent narratives about many details of the Agreement.

### a.    The Making of the Agreement

Exactly when the Agreement came into existence is, at best, unclear. Allen initially asserts that there was an agreement in place prior to 2006 wherein Cox had said "I will take care of you if you take care of me."[34]  Allen also suggests

---

[31]    *See* Cox. Aff. ¶ 16.

[32]    *See id.* ¶ 10.

[33]    *See id.* ¶¶ 9-12.

[34]    Allen Tr. at 37:9-12.

that the Agreement came into existence when he informed Cox of the possibility that she had a medical malpractice lawsuit.[35]  However, in connection with this possibility, he notes that Cox repeated her promise to pay "many times, including when the lawsuit was starting."[36]  Allen further states that the Agreement was made on Father's Day in 2006, although it is unclear exactly what was promised on that date.[37]  Though Allen admits that there were no witnesses to the making of the Agreement, he does allege that Cox affirmed its existence to two witnesses in the years following the Agreement.[38]

###### b.   The Consideration for the Agreement

While Allen contends that the Agreement was a "service contract," he presents multiple possibilities regarding what he actually did or was supposed to do for Cox pursuant to the Agreement.  Early in his deposition, Allen mentions assisting Cox "when she came home from the hospital," including driving her to and from chemotherapy treatments.[39]  This involved care provided for Cox after

---

[35]   *See id.* at 38:12-24.

[36]   *Id.*

[37]   *See id.* at 43:18-22.

[38]   *See id.* at 44:20-24, 45:4-14.

[39]   *Id.* at 28:3-5.

her surgery in 2002.[40]   Allen also notes that he provided "basic care" for Cox in June and July of 2006, though she was no longer getting chemotherapy at that time.[41]   Allen also makes reference to an agreement to "take care" of Cox that was part of an understanding in place prior to the 2006 Agreement.[42]   Allen further suggests that the Agreement was made in consideration for helping Cox "get back on her feet," at around the time the lawsuit was beginning.[43]   Additionally, Allen testified that the real consideration for the Agreement was Allen's "love and care."[44]   Allen also noted in the later portions of his deposition that the Agreement was made in consideration of helping Cox get "through this," and it encompassed services spanning their entire relationship.[45]   Only at one point, in the latter half of his testimony, did Allen make specific reference to doing laundry, washing and giving Cox medicines and injections "in exchange for this money."[46]

---

[40]   *See id.* at 28:15-16.

[41]   *Id.* at 30:6-8.

[42]   *Id.* at 30:20-22.

[43]   *Id.* at 38:19-24.

[44]   *Id.* at 49:14.

[45]   *Id.* at 84:13-21.

[46]   *Id.* at 82:14-25.

c.      **The Amount of Compensation Under the Agreement**[47]

Allen's deposition testimony also contains multiple possibilities as to the amount that Allen would be paid for his services under the Agreement. Allen initially suggests that he was to receive "royalty benefits for taking care of" Cox in an unspecified amount.[48] Allen also testified that his compensation under the Agreement was to be "basically" the "settlement amount," though he was not sure exactly how much that amount was.[49] Regarding the Agreement as of Father's Day 2006, Allen characterizes Cox as saying, somewhat ambiguously, "This is yours, Leonard. Everything we went through, all over the world, to Chicago, and we went . . . ."[50] At one point in his testimony, Allen also denied that he was owed $700,000 — or any other specific amount — and instead claimed to be entitled to "whatever the number was with her in that bank account."[51] Allen also indicated

---

[47]      The Complaint suggests a progression whereby Cox initially promised Allen the total settlement amount of one million dollars and subsequently lowered that amount to $800,000, and then again to $700,000. *See* Compl. ¶¶ 14, 24, 27. While the record can be read to support different versions of the amount promised, this progression has no basis in the record.

[48]      Allen Tr. at 30:20-22.

[49]      *Id.* at 40:24-42:8.

[50]      *Id.* at 43:18-22.

[51]      *Id.* at 55:15-25. *Accord id.* at 57:16-23 ("Whatever that Chase Bank, whatever is at Chase Bank in Leonard and Helen's name, that money was for me.").

10

that Cox never agreed to a specific amount of money to be paid under the Agreement in 2006.[52]  Allen also stated that Cox had mentioned $700,000 at some point, but had never mentioned $800,000.[53]

### d.  The Time and Performance of the Agreement

The Complaint alleges that the entirety of the Agreement could have been performed within a year and that the money would be available within "a matter of weeks."[54]  While no one disputes that the settlement funds were available shortly after June of 2006, Allen later claimed that the Agreement was made for services spanning "the entirety of us [Allen and Cox] knowing each other."[55] Specifically, Allen suggests that the Agreement was somehow rooted in the "entire 25 years" that he and Cox had lived together and during which time Allen "was taking care of [Cox] through the sickness."[56]  Allen also stated that Cox proposed the terms of the Agreement "many times," including in 2006.[57]

### E.  The Parties' Interactions Subsequent to the Agreement

[52]   *See id.* at 58:5-7.

[53]   *See id.* at 58:5-59:22.

[54]   Compl. ¶ 19.

[55]   Allen Tr. at 84:13-85:2.

[56]   *Id.*

[57]   *Id.*

11

Cox received her settlement money on or about July 1, 2006.[58]  In either 2006 or 2007, Cox deposited $100,000 into Allen's personal checking account.[59]  Allen claims that this $100,000 was neither payment for his services nor a gift.[60]  Instead, Allen claims that this deposit was "something she did [] without talking to me," or that it was deposited for the care of their son Joseph.[61]  Allen further claims that immediately following the settlement, Cox made all the settlement money available to him by depositing it in a joint account.[62]  In fact, Allen used that money, possibly in conjunction with the $100,000 he received from Cox, to purchase, among other things, a yacht and a Cadillac DeVille for more than $40,000.[63]

### F.   Cox's Alleged Breach

Sometime around 2007 or 2008, Cox began taking the settlement money out of her joint account with Allen.[64]  During that time, Cox moved the

---

[58]   *See* Def. 56.1 ¶ 5.

[59]   *See* Allen Tr. at 34:12-19.

[60]   *See id.* at 35:11-19, 51:17-22.

[61]   *Id.* at 35:17-18.  *Accord* Allen Aff. ¶ 9.

[62]   *See* Allen Tr. at 46:18-49:11.

[63]   *See id.* at 46:18-49:11, 57:16-23; *see also* Def. 56.1 ¶ 14.

[64]   *See* Allen Tr. at 62:14-63:4.

money into a certificate of deposit and Allen stopped receiving statements about the joint account.[65]  In late 2008 or early 2009, Allen realized that Cox was lying to him about the money, and began to look for an attorney.[66]  Ultimately, Allen claims he never received the money he was entitled to and that it was stolen by Cox.[67]

Allen commenced this action on September 16, 2010 alleging (1) breach of contract; (2) conversion; (3) misrepresentation; (4) fraud; and (5) prima facie tort.  As a result of this Court's decision on Cox's motion to dismiss, Allen's lone surviving claim was for breach of contract.  Following a contentious discovery phase, Cox now moves for summary judgment.

## III.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

---

[65]   *See id.* at 72:20-73:13.

[66]   *See id.* at 73:17-74:2.

[67]   *See id.* at 30:23-31:5, 62:14-21.

law."[68]  "'An issue of fact is genuine if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party.  A fact is material if it might affect

the outcome of the suit under the governing law.'"[69]  "[T]he burden of

demonstrating that no material fact exists lies with the moving party . . . ."[70]

"When the burden of proof at trial would fall on the nonmoving party, it ordinarily

is sufficient for the movant to point to a lack of evidence to go to the trier of fact

on an essential element of the non[-]movant's claim."[71]

        To defeat a motion for summary judgment, the non-moving party

must raise a genuine issue of material fact.[72]  The non-moving party must do more

than show that there is "'some metaphysical doubt as to the material facts,'"[73] and

it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[74]

---

[68]     Fed. R. Civ. P. 56(c).

[69]     *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 34 (2d Cir. 2008)).

[70]     *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)).

[71]     *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

[72]     *See id.*

[73]     *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[74]     *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[75]

     In determining whether a genuine issue of material fact exists, the court must "constru[e] the evidence in the light most favorable to the non-moving party and draw all reasonable inferences" in that party's favor.[76]  However, "'only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.'"[77]  "'Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"[78]  Summary judgment is therefore "appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[79]

---

[75] *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)).

[76] *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson*, 477 U.S. at 247-50, 255).

[77] *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2d Cir. 1997)).

[78] *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).

[79] *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009).

## IV.   APPLICABLE LAW[80]

### A.   Breach of Contract

To make out a breach of contract claim under New York law a plaintiff must show "(1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach."[81]   A breach of contract claim "that fails to allege facts sufficient to show that an enforceable contract existed between the parties is subject to dismissal."[82]

Under New York law, "before the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained."[83]

---

[80]   Because both parties cite exclusively to New York law, I will assume that New York law controls the present dispute.   *See Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000).

[81]   *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) and *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).

[82]   *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008) (quotation marks omitted).

[83]   *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (1981).  *Accord Cobble Hill Nursing Home v. Henry & Warren Corp.*, 74

> The doctrine of definiteness or certainty is well established in contract law.  In short, it means that a court cannot enforce a contract unless it is able to determine what in fact the parties have agreed to . . . .  [I]f an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract.[84]

A claim for breach of contract must therefore be supported by "evidence establish[ing] that there was [a] meeting of the minds between the parties as to essential contract terms."[85]  For "an agreement to be enforced, it must be sufficiently definite and explicit so [that the parties'] intention may be ascertained to a reasonable degree of certainty."[86]  "Material terms" of a contract that require definition include "time, manner of performance and payment schedule."[87]

---

N.Y.2d 475, 482 (1989) ("Few principles are better settled in the law of contracts than the requirement of definiteness."); Restatement (Second) of Contracts § 33 (1981).

[84]   *166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*, 78 N.Y.2d 88, 91 (1991).

[85]   *Kolmar Am., Inc. v. Marathon Petroleum Co., LLC*, 915 N.Y.S.2d 246, 247 (1st Dep't 2011).  *Accord Lapine v. Seinfeld*, 918 N.Y.S.2d 313, 318 (Sup. Ct. N.Y. Co. 2011).

[86]   *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 842 F.2d 578, 587 (2d Cir. 1987).  *Accord Allied Sheet Metal Works, Inc. v. Kerby Saunders, Inc.*, 619 N.Y.S.2d 260, 263 (1st Dep't 1994) ("The agreement is required to be sufficiently definite so that a court can ascertain its terms for the purpose of determining whether it has been breached and avoiding imposition of contractual obligation under circumstances where intent to conclude a binding agreement is not present.").

[87]   *Power Cooling Inc. v. Churchill School & Ctr.*, 792 N.Y.S.2d 452, 453 (1st Dep't 2005).

Moreover, "[a] plaintiff faces a heavier burden when trying to prove an alleged oral contract.  To ensure that parties are not trapped into surprise contractual obligations that they never intended, more than agreement on each detail is required, there must be an overall agreement to enter into the binding contract."[88]

## V.   DISCUSSION

Cox argues that this case must be dismissed because (1) there was no contract or performance; (2) any contract that did exist was a violation of the statute of frauds; and (3) the case merits dismissal for plaintiff's failure to comply with discovery.  While I decline to dismiss this case based on spoliation of evidence, I do note that Allen has failed on multiple occasions to produce either his medical records or bank records.  Additionally, the constant bickering and hostile communications between the attorneys in this case has created unnecessary hardship for both the parties and the Court.  In any event, after reviewing the merits of this case, the alleged Agreement is indefinite and vague, and the ambiguous deposition testimony elicited from Allen fails to support the existence of a binding agreement.  Because I find that the Agreement is vague as a matter of law, I do not address Cox's defense based on the statute of frauds.

### A.   At No Time Did the Parties Create a Binding Agreement

_____

[88]   *Cleveland Wrecking Co. v. Hercules Constr. Corp.*, 23 F. Supp. 2d 287, 293 (E.D.N.Y. 1998).

Allen has not met his burden of responding to Cox's contentions that Allen's claims are unsupported.[89]  While Allen's deposition testimony does refer to specific statements made on Father's Day of 2006, it is wholly unclear what, if anything, was agreed to at that time.  Allen proffers only that Cox said at that time "This is yours."[90]  Meanwhile, portions of the alleged Agreement, including the specific consideration and amount of compensation to be paid, were communicated both before the settlement, after the settlement, and "many times."[91]  In fact, Allen stated at one point that the Agreement dated back to when Cox had cancer years before 2006.[92]  Without knowing even approximately when this Agreement was entered into or finalized, it is nearly impossible to determine what, if any, binding terms were agreed to by the parties.  Moreover, despite the fact that Allen claims that two witnesses can corroborate the existence of the Agreement,[93] he has failed

---

[89]     *See Jaramillo*, 536 F.3d at 145.  While Cox has improperly submitted twenty-three exhibits in violation of this Court's Individual Rules of Practice, Allen has submitted almost no documentary evidence at all that substantively support his claim.

[90]     Allen Tr. at 43:18-22.

[91]     *Id.* at 37:9-12, 38:12-24, 82:14-25, 84:13-85:2.

[92]     *See id.* at 37:3-12.

[93]     *See* Compl. ¶ 22 ("Defendant restated her promise to pay regularly and in the presence of others; namely Aleta Kippins and Dr. Luvenia Allen.").

to provide any evidence from such witnesses.[94]

### B.   The Consideration and Compensation Under the Agreement Were Vague and Undefined

There is not one iota of evidence in the record suggesting that the consideration in the Agreement went beyond caring for or tending to Cox. However, it is well-settled in the law that "[t]he words to 'take care of' . . . are too vague to spell out a meaningful promise."[95]  Of note, Allen has not proffered any evidence to rebut Cox's extensive evidence that she did not need injections or medicines in 2006.  Cox had also completed chemotherapy and her cancer was safely in remission years before 2006.[96]  Thus, Allen's reliance on the creation of a contract based on agreements to "take care of" or "love and care" are legally

---

[94]     It is further unclear what, if anything, was affirmed in the presence of these witnesses.  *See, e.g.*, Allen Tr. at 45:4-6 (noting only that "she [Cox] said to my ex-wife how she was going to *take care* of granddaddy") (emphasis added).

[95]     *Dombrowski v. Somers*, 41 N.Y.2d 858, 859 (1977).  *Accord United Res. Recovery Corp. v. Ramko Venture Mgmt., Inc.*, No. 07 Civ. 9452, 2009 WL 2746232, at *6 (S.D.N.Y. Aug. 28, 2009) ("Taken alone, Gutierrez's vague and ambiguous statement that Kohut would be 'taken care of' is too indefinite to form a legally enforceable contract."); *Cohn v. Levy*, 725 N.Y.S.2d 376, 376 (2d Dep't 2001) (noting that a "promise[] to 'take care of [plaintiff] in a very comfortable way' could not create a binding commitment"); *Tompkins v. Jackson*, 866 N.Y.S.2d 96, 96 (Sup. Ct. N.Y. Co. 2008) ("Nor is the alleged agreement . . . 'to take care of the plaintiff' for some indefinite period of time, in the absence of any definition of 'take care of,' sufficient to support a claim for breach of contract.").

[96]     *See* Cox Aff. ¶¶ 3-8.

insufficient.  Indeed, under a contract based on such vague directives, Allen's duties would have been both unknown and unknowable.  There is no evidence, for example, that this Agreement to "take care" could be settled by reference to some external objective standard.[97]  Moreover, to the extent that Allen engaged in more concrete actions such as giving injections or administering medicine prior to 2006, those actions did not involve Cox's recovery in or after 2006 — the focus of the alleged Agreement.[98]

Furthermore, Allen's testimony is contradictory and unclear regarding what compensation he was promised — a material term of the agreement.[99]  While the Complaint alleges an initial Agreement of one million dollars followed by modifications adjusting the sum downward to $800,000 and then to $700,000,[100]

---

[97]    *See Cobble Hill*, 74 N.Y.2d at 483 ("Before rejecting an agreement as indefinite, a court must be satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic standard that makes its meaning clear.").

[98]    *See* Compl. ¶ 16.

[99]    *See Gutkowski v. Steinbrenner*, 680 F. Supp. 2d 602, 610 (S.D.N.Y. 2010); *Hecht v. Helmsley-Spear, Inc.*, 885 N.Y.S.2d 292, 292 (1st Dep't 2009) ("[O]ral assurances lacking any actual terms as to the amount, form, and timing of payment of any compensation, and including no methodology or custom providing for the determination of the same, failed to manifest a clear intention on the part of the parties to form a binding, definite severance agreement.").

[100]    *See* Compl. ¶¶ 14, 24, 27.

21

Allen admits that Cox never mentioned the possibility of $800,000.[101]  Moreover,

Allen wavers between stating that the Agreement was for the entire settlement, for

whatever was in Cox's bank account, and for the fixed sum of $700,000.[102]  In fact,

at times, Allen's testimony suggests that the Agreement did not involve monetary

compensation[103] — a likely possibility given that the Agreement predated any

recovery in Cox's medical malpractice suit.  Thus, without any definitive

agreement as to price, Cox could not have known what her obligations would be

under the Agreement.  For instance, even if Cox believed that she had in some way

obligated herself to Allen, she may have intended to satisfy that obligation with the

otherwise-unexplained deposit of $100,000 that she made into Allen's personal

bank account.[104]

### C.     The Duration of the Agreement Was Unknown

Finally, the duration and time-period of this alleged contract has not

been defined.  On the one hand, Allen claims that this contract could have been

---

[101]     *See* Allen Tr. at 58:5-59:22.

[102]     *See, e.g.*, *id.* at 41:24-42:7, 55:15-56:9.

[103]     *See, e.g.*, *id.* at 37:9-11 ("I will take care of you if you take care of me.").

[104]     Indeed, Cox maintains that she gave Allen the $100,000 as well as "other substantial purchases I had made out of the settlement funds, worth tens of thousands of dollars."  Cox Aff. ¶ 10.

fully performed within a year.[105]  On the other hand, Allen indicated that the

Agreement was in consideration for the entire twenty-five years that Cox and Allen

had known each other.[106]  Moreover, based on such loose terminology as an

obligation to "take care of" and "love and care," it is conceivable that this

Agreement pertained to some indefinite duration of Cox's illnesses and recoveries.

In fact, Allen admits that he never thought the Agreement would become

controversial because he anticipated that "we would be living together forever,"

and thus, presumably, sharing their anticipated wealth.[107]  As such, Allen has not

shown that the Agreement contained any boundaries or time-frames in which its

fulfilment could have been expected or demanded.  The Agreement is thus

impermissibly vague in terms of its duration — an essential contractual term.[108]

Additionally, had the parties agreed to such sweeping terms, this Agreement would

have violated the statute of frauds' bar on oral contracts incapable of performance

within one year.

      In sum, this case is a poster child in support of the doctrine of

---

[105]    *See* Compl. ¶ 18.

[106]    *See* Allen Tr. at 84:15-17.

[107]    *See id.* at 42:4-5.

[108]    *See Best Brands*, 842 F.2d at 590.

definitiveness.  In order to avoid placing substantial obligations on a party by surprise, the law insists that agreements be clear and concrete.  Where parties live together and interact casually over the course of a twenty-five-year relationship, it would be unfair to construe their past hopes and aspirations as future binding obligations.

## VI.    CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted.  The Clerk of the Court is directed to close this motion [Docket No. 26] and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:       New York, New York
             October 19, 2011

**- Appearances -**

**For Plaintiff:**

Kamelia Katrina Poppe, Esq.
Law Firm of Shaw & Associates, P.C.
450 Seventh Avenue, Suite 3002
New York, NY 10123
(646) 380-9556


**For Defendant:**

Dan Brecher, Esq.
Scarinci & Hollenbeck, LLC
99 Park Avenue, 16th Floor
New York, NY 10016
(212) 286-0747